COUNTRY TWEEDS, INC., a corporation, and Marcus Weisman, individually and as an officer of the said corporation, Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 57, Docket 28014.

United States Court of Appeals Second Circuit.

Argued Oct. 15, 1963.

Decided Jan. 3, 1964.

Barshay & Frankel, New York City (Nathan Frankel, New York City, of counsel), for petitioners.

James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Miles J. Brown, David B. Morris, Attys., Federal Trade Commission, for respondent.

Before WATERMAN, HAYS and MARSHALL, Circuit Judges.

WATERMAN, Circuit Judge:

This is a petition to review a cease and desist order of the Federal Trade Commission issued after the Commission had determined that certain advertising practices of petitioners violated Section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1).

The petitioners are Country Tweeds, Inc., a New York corporation engaged in the manufacture of ladies' cashmere coats and other clothing products, and the corporation's president, Marcus Weisman. In early 1958 Country Tweeds, which does not itself manufacture the cashmere fabric used in its coats, began purchasing its requirements of cashmere from a new supplier, Cashmere Products, Ltd. Country Tweeds had formerly purchased its cashmere from Einiger Mills, Inc., but changed suppliers because it be-

lieved that the cashmere produced by Einiger was no longer the best on the market. Petitioners called the new fabric "Country Tweeds El Elegant Cashmere."

Petitioners submitted two samples of cashmere fabric to the United States Testing Company. One sample, the fabric formerly purchased from Einiger, it labeled "Best Quality Cashmere produced to date"; the other sample, the new fabric it was then using, it labeled "Country Tweeds El Elegant Cashmere." The testing company subjected the samples to three comparative tests requested by petitioner: (1) an abrasion test; (2) a breaking load test; (3) a dry cleaning test. A two page report was then submitted to petitioners setting forth the results of the tests and in this report the testing company designated the samples by the designations given them by petitioners. The report was on the official letterhead of the testing company, and it was signed by two of its officials.

After receiving the report petitioners altered it and in so doing reduced its size to one page. It was then sent, in its altered form, to petitioners' dealers throughout the United States. At the same time petitioners also furnished to the dealers a brochure, which included the following information:

"Q. How do I know El Elegant cashmere is my best buy? A. Recent tests by U. S. Testing, the world's largest independent laboratory, proclaimed El Elegant the best money could buy."

The report as thus altered and distributed contained a reproduction of the testing company's official letterhead and the two signatures which were on the original report, but the body of the original report was changed. The petitioners changed that portion of the testing company's report dealing with the dry cleaning test by merely printing the testing company's stated results without the introductory material which had appeared in the original report explaining in detail the manner in which the test was conducted.

The portion of the altered report that dealt with the other two tests eliminated even more.

In the original report the testing company had set forth the results it had reached for the abrasion test in terms of the number of abrading cycles necessary to produce a given degree of wear for each sample. The report set forth that "Country Tweeds El Elegant Cashmere" had withstood 715 cycles, while "Best Quality Cashmere produced to date" had withstood only 673. The testing company inserted in its report, immediately after the statement of this result in its tests, the following "Comment": "Test results indicate no significant difference in abrasive resistance between the two submitted samples. It is noted that there is no significant difference in 'roughing up' in the intermediate stages of wear." In the altered report petitioners omitted this qualifying statement and expressed the test results in the following language: "COUNTRY TWEEDS' El Elegant 100% Cashmere lasts 6.3% longer than Best Quality Cashmere produced to date."

The results of the breaking load test were expressed by the testing company in its original report in terms of a given number of test pounds. Numerals indicating the measure of the results for each sample were set forth for both "warp" and "filling." The numerals for "Best Quality Cashmere produced to date" were 29.6 for "warp" and 14.5 for "filling." The numerals for "Country Tweeds El Elegant Cashmere" were 28.5 and 22.7 for these two categories. The report as altered by petitioners described the test results in the following terms: "COUNTRY TWEEDS' El Elegant 100% Cashmere proves 56.5% stronger than Best Quality Cashmere produced to date." This 56.5% figure accurately represents only the percentage of difference between the original test results that dealt with "filling." The percentage figure does not take into account the difference in original test results for "warp," a difference which showed that "Best Quality Cash-

mere produced to date" performed better in this regard than "Country Tweeds El Elegant Cashmere."

On the basis of these facts, undisputed by petitioners, the Commission concluded that petitioners had violated Section 5 of the Federal Trade Commission Act by falsely representing: (1) That the United States Testing Company, prior to the comparative tests conducted on both samples, had already found one of the fabrics to be the best quality cashmere produced up to that time; (2) That "Country Tweeds El Elegant Cashmere" was in fact 56.5% stronger than another fabric subjected to a breaking load test; and (3) That the altered test report which was circulated was an authentic reproduction of the report originally submitted to petitioners by the United States Testing Company.

The record amply supports the conclusions of the Commission that petitioners made representations which were false, misleading, and deceptive. Petitioners, admitting that the altered report was not an authentic facsimile of the original report, contend that it was a fair summary of the original, framed in less technical terms. We find it impossible to accept this contention. Even if we were convinced (which we are not) that framing the test results in percentage terms did not cause the test results to appear more favorably to the fabric petitioners were interested in promoting, we would still be compelled to refuse to hold the altered report a fair summary. In the original report the testing company, immediately below the formal statement of the abrasion test results, had explained that the results were to be interpreted as evidencing no significant difference between the two fabrics tested. Petitioners chose to delete this important qualifying statement from the altered report which they distributed, simply stating that the fabric they were then using would last 6.3% longer than the other fabric. Thus, though the testing company had stated in the original report that the fabrics tested showed no signifi-

cant difference when subjected to the abrasion test, petitioners chose to attribute to the company the opinion that one of the fabrics tested would last longer than the other.

What petitioners did in "summarizing" the results of the breaking load test was even more misleading. The test which was conducted involved two aspects, one dealing with "warp" and one dealing with "filling." The figures in the original report favored the fabric petitioners were interested in with respect to "filling," but showed that the other fabric had performed slightly better in the "warp" test. The percentage figure published in the altered report was one which presented the difference between the performance of the two fabrics with respect to "filling" only.

 We agree with the Commission that this publication went beyond the mere misrepresentation of a testimonial or an endorsement; it amounted to a direct misrepresentation of the quality of petitioners' cashmere. A national testing company had given petitioners a report setting forth the comparative performance of two fabrics as a result of tests conducted at the behest of petitioners. Petitioners, in advertising one of those fabrics, made representations about it which were not supported by the test results they had received.

The Commission also found that petitioners had falsely represented that the testing company had previously tested one of the fabrics and had found it to be the best quality produced up to that time. Petitioners, when they submitted the competing fabric to the testing company, labeled it "Best Quality Cashmere produced to date." In their original report the testing company, as petitioners could well anticipate, designated the samples by the names petitioners had given them when the samples were submitted for testing, and petitioners carried over these names into the altered test report.

The Commission was correct in concluding that the report distributed by petitioners, which labeled the competing product tested as "Best Quality Cashmere produced to date," falsely represented that the testing company had previously tested the fabric and had found it to be of the best quality up to that time. Publication of the results of the comparative performance of these two fabrics in three tests carried with it the implication that the one labeled "Best Quality Cashmere produced to date" had previously been subjected by the testing company to a battery of tests that had established that quality, tests that were at least similar to those being then reported. Admittedly no prior tests had been conducted.

That the public was not misled in this particular by any alteration of the original test report, but as a consequence of petitioners' original labeling of the fabrics which it failed to change when passing the test results on to the public, did not soften the fact that petitioners published representations which were misleading and deceptive. Moreover, it would be immaterial if petitioners honestly believed the competing fabric was the best produced up to the time they shifted to the other fabric, or even if this was in fact so; for petitioners were found to have misrepresented the findings of the testing company by their publication, irrespective of the quality of the competing fabric.

 Petitioners also argue that they are saved by certain additional information which appeared in the altered report. They point to the statement at the top of the published report, which also appeared in the original report, which identified the two fabrics tested: "Two samples of fabric sampled and identified by Client as below. Order No. 4424 dated 2/4/58." Petitioners also note that the capitalization used in the label "Best Quality Cashmere produced to date" should have prevented the public from being misled. But, as the Commission correctly stated, it is immaterial that a given phrase considered technically may be construed so as not to constitute a misrepresentation. Kalwajtys v. F. T. C.,

237 F.2d 654 (7 Cir. 1956), cert. denied. 352 U.S. 1025, 77 S.Ct. 591, 1 L.Ed.2d 597 (1957). What is important in determining whether a statement is misleading is the over-all impression it tends to create on the public. Murray Space Shoe Corp. v. F. T. C., 304 F.2d 270 (2 Cir. 1962). Statements susceptible of both a misleading and a truthful interpretation will be construed against the advertiser. Id. 304 F.2d at 272; United States v. Ninety-Five Barrels of Vinegar, etc., 265 U.S. 438, 443, 44 S.Ct. 529, 68 L.Ed. 1094 (1924). We are of the opinion that the Commission could legitimately conclude that the over-all impression created by the published report was deceptive and misleading. Moreover, whatever doubts one might have had about the Commission's conclusion on this issue are dispelled when note is taken of the statements made in the brochure which petitioners circulated at the same time as they circulated their report. In that brochure petitioners stated that "recent tests by U. S. Testing Company, the world's largest independent testing laboratory, proclaimed El Elegant cashmere the finest money could buy." This could only be interpreted as meaning that the testing company, before conducting the comparative tests which allegedly proved that petitioners' fabric was better than the other sample tested, had been satisfied that the other sample was the best quality cashmere up to that time.

■ Petitioners also contend that the complaint filed by the Commission was inadequate to apprise them of the Commission's disapproval of the particular trade practices that the proof and findings ultimately developed. We find no merit to this contention. There was no fatal variance between the complaint and the proof and findings. Petitioners were given adequate notice of the deceptive practices which the Commission ultimately found they had committed. See Standard Distributors, Inc. v. F. T. C., 211 F.2d 7 (2 Cir. 1954). Petitioners claim that these proceedings were not in the public interest. What we have

said heretofore would seem effectively to dispose of this make-weight. They also suggest that inasmuch as they had ceased their illegal conduct prior to the issuance of the complaint the Commission was thereby deprived of the power to issue a cease and desist order. Although persuasive of a less harsh order than otherwise, this change in their policies does not wholly absolve petitioners. See Giant Food, Inc. v. F. T. C., 322 F.2d 977 (D.C. Cir. 1963).

■ We come now to a consideration of the order the Commission formulated. Petitioners object to the order as it now stands, more particularly to paragraph 4 thereof, on the ground that it is framed in terms which are too broad and which are not justified in the light of the Commission's findings. The paragraph claimed to be offensive orders petitioners to refrain from "misrepresenting in any manner the quality of cashmere or other fabric in their merchandise." We agree with petitioners that the order should be modified by striking paragraph 4.

■■ It is true that the Commission has wide discretion in its choice of remedies, and courts traditionally have accorded deference to orders promulgated by the Commission. See, for example, Hoving Corp. v. F. T. C., 290 F.2d 803 (2 Cir. 1961). But though the scope of review of a Commission order is limited and the courts must recognize the necessity for Commission orders adequate to cope with the violators which it discovers, a court must still demand that there be some relation between the violations found and the breadth of the order. F. T. C. v. Mandel Bros., Inc., 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); F. T. C. v. National Lead Co., 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); N. L. R. B. v. Crompton-Highland Mills, Inc., 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949); N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941). An order is not entitled to enforcement if the court reviewing it finds that "the remedy selected has no reasonable relation to the unlawful

practices found to exist." Jacob Siegel Co. v. F. T. C., 327 U.S. 608, 613, 66 S. Ct. 758, 760, 90 L.Ed. 888 (1946).

The Supreme Court, moreover, has indicated in a recent statement the importance of carefully scrutinizing orders of the Commission, and has suggested the need for the Commission's formulating them with sufficient specificity. F. T. C. v. Henry Broch & Co., 368 U.S. 360, 82 S.Ct. 431, 7 L.Ed.2d 353 (1962). The Court's pronouncement was the result of certain amendments to Section 11 of the Clayton Act, 73 Stat. 243 (1959), 15 U.S. C. § 21 (Supp. IV 1959–62), amending 38 Stat. 734 (1914), which were designed to accord to orders dealing with Clayton Act violations the same finality which has traditionally characterized orders issued under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. H.R. Rep.No. 580, 86th Cong., 1st Sess. (1959), U.S.Code Cong. & Adm.News 1959, p. 1804. Though refusing to sanction the modification of a broad Commission order which had been entered before the 1959 amendments, the Court was careful to note that this was not to be taken as a sign that it would approve the order under the new law. The Court then went on to say: "The severity of possible penalties prescribed by the amendments for violations of orders which have become final underlines the necessity for fashioning orders which are, at the outset, sufficiently clear and precise to avoid raising serious questions as to their meaning and application." 368 U.S. at 367–368, 82 S.Ct. at 436, 7 L.Ed.2d 353.

It is difficult to imagine an order couched in more sweeping language than the one now before us. Petitioners, found guilty of misrepresenting the quality of their cashmere through the misuse of test results, have been ordered to refrain from misrepresenting "in any manner" the quality of their fabrics. This Court, subsequent to Hoving v. F. T. C., supra, in a series of recent cases dealing with illegal payments to buyers under Section 2(d) of the Clayton Act, as amended, 15 U.S.C. § 13(d), and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, has not hesitated to modify broad Commission orders which went beyond the particular illegal practices found to exist. American News Co. v. F. T. C., 300 F.2d 104 (2 Cir.), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L. Ed.2d 64 (1962); Grand Union Co. v. F. T. C., 300 F.2d 92 (2 Cir. 1962); Swanee Paper Corp. v. F. T. C., 291 F.2d 833 (2 Cir. 1961), cert. denied, 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962). See also Vanity Fair Paper Mills, Inc. v. F. T. C., 311 F.2d 480, 487 (2 Cir. 1963), where the court, though refusing to accept some modifications proposed by petitioner, nevertheless did narrow the order to make it "somewhat better related to * * * [petitioner's] offending while still sufficiently prohibiting 'variations on the basic theme.' "

The principles which prompted this court in the above cases to narrow Commission orders apply with equal force here, though the violation to which the instant order is directed is deceptive advertising. The First Circuit, on two occasions, has been critical of Commission orders directed to deceptive advertising and labeling which were, in some respects, less broad than the order now before us. Korber Hats, Inc. v. F. T. C., 311 F.2d 358 (1 Cir. 1962); Colgate-Palmolive Co. v. F. T. C., 310 F.2d 89 (1 Cir. 1962). We think it advisable again to note that petitioners in this case have ceased to engage in the advertising practice which prompted the order, and voluntarily did so well before the Commission filed its complaint. Cessation of the offending activity, with the likelihood that the petitioner will not again resume it or a related activity, has been one factor which courts have considered in limiting broad Commission orders. Grand Union Co. v. F. T. C., supra, 300 F.2d at 100; Swanee Paper Corp. v. F. T. C., supra, 291 F.2d at 838.

The order will be enforced with paragraph 4 thereof deleted.